105 So.2d 380 (1958)
Curtis RUSSOM, Appellant,
v.
STATE of Florida, Appellee.
No. 57-142.
District Court of Appeal of Florida. Third District.
September 16, 1958.
Rehearing Denied October 17, 1958.
*381 R.K. Bell, Miami, for appellant.
Richard W. Ervin, Atty. Gen., and John C. Reed, Asst. Atty. Gen., for appellee.
HORTON, Acting Chief Judge.
The appellant was indicted, tried and convicted of rape. A majority of the jury recommended mercy and the court sentenced the appellant to life imprisonment. This appeal is from the judgment of conviction and sentence.
The appellant has raised four points upon which he seeks reversal of the conviction and sentence. Nowhere does the appellant attack the sufficiency of the evidence to support the jury verdict. His principal attack is upon alleged procedural errors occurring during the course of the trial, all of which he concludes were prejudicial to the appellant and require a reversal. Inasmuch as we are confronted with a judgment and sentence which deprive the appellant of his liberty for life, we shall consider all of the alleged errors presented.
On cross examination of the appellant, the prosecutor attempted to elicit certain information regarding a possible unpleasant occurrence in Victoria, Texas. Counsel for the appellant objected to this line of examination and was upheld by the trial judge. The questioning never reached the state of disclosing anything prejudicial to the appellant; however, upon request of appellant's counsel, the trial judge instructed the jury to disregard the questions. We fail to find any error harmful to the appellant as a result of this interchange. Some of the information was volunteered by the appellant prior to objection and certain other information was later explained. No harm to the appellant is apparent.
The appellant also objects to the testimony of an examining physician whose statement tended to show that the prosecutrix was chaste, on the ground that the *382 state was putting the prosecutrix' character into issue when the defendant had not attacked it. This position is clearly without merit. The appellant's whole defense was based upon the consent of the prosecutrix and accordingly, testimony regarding her chastity would be admissible. Raulerson v. State, Fla. 1958, 102 So.2d 281. The court was presented with competent medical opinion, which was not rebutted, to the effect that the prosecutrix was a virgin prior to the rape.
The appellant also contends that the trial judge erred in refusing to compel the State Attorney to produce all pre-trial statements by witnesses or the prosecutrix for examination by appellant's counsel. The testimony and evidence adduced at trial never disclosed the existence of any statements given to the State Attorney nor did the motion designate a particular statement or paper. The motion was made on the belief of appellant's counsel that such writings did exist. We have reviewed the motion to compel the production of the alleged documents and find it to be beyond the scope of the rule in Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103. In Smith v. State, Fla. 1957, 95 So.2d 525, the court held that a State Attorney could not use pre-trial statements and memoranda for impeachment purposes without permitting defense counsel to examine them. This is not the case we have before us. The state had used no such statements nor is there any evidence that such statements exist.
A more serious question is raised by the appellant's final point. He contends that he was denied a fair and impartial trial through the misconduct of one juror. The misconduct complained of consisted of the alleged concealment of prejudice by the juror when questioned on voir dire examination. Subsequent to the trial, the juror made certain comments indicating previous experience of a similar nature involving his daughter. The appellant made this incident a ground of his motion for new trial and the court below heard testimony, including the juror's upon the question of the alleged misconduct. The motion was denied.
The determination of the qualifications and conduct of jurors is under the sole jurisdiction of the trial judge and any decision thereon rests largely within his discretion. See Adams v. Elliott, 128 Fla. 79, 174 So. 731, 736. We review these proceedings to the end of determining if an abuse of discretion is evident. The juror testified as follows:
"Q. [By Mr. Bell] Did you make a statement? "A. When I left this courtroom here, the Judge told me we were free and clear to discuss the case. A gentleman came up to me and said, `How did you decide this case?'
"Q. Don't tell us 
"The Court: Go ahead.
"A. (Continued) `How did you decide this case?' I said, `Mr., it was just and nothing I could do.' Mr. Bell asked without any doubt, any shadow of a doubt whether there was any guilt. I said, `This thing has got to stop; it's got to stop.' I said, `Something happened like this some years ago to my daughter. My wife threw it out. She said, "Oh, there is nothing to it."' But naturally a man is going to look and take care of his own family. I said, `If that was the case, I don't like it.' I even say today it has got to stop. I didn't make any statement to any newspaper man, and he can't come up before this court and actually give any record of any words I said, except `It has got to stop; this happened years ago to my family.'
* * * * * *
"Q. Did you or did you not make the statement that you were not sure that the defendant, Mr. Russom, was the man involved with your daughter? A. No, sir.

*383 "Q. You didn't make that statement? A. The only statement I made, neither you nor the other attorneys never convinced me; I gave you everything, the least little shadow of a doubt that you asked me, I gave it all to you, everything. I would turn the case loose completely if it wasn't for three or four words.
* * * * * *
"Q. [By Mr. Gerstein] Do I understand correctly, Mr. Goodyear, the incident in which a member of your family was involved some fifteen years ago, that there were no court proceedings as a result of that? A. No. My wife wouldn't even let that come up.
"Q. In other words, nothing to prosecute  A. Nothing at all. My wife said, `It is a silly schoolboy prank. What do you want to bring it up for?' I said, `I just don't like it.' From that day on I always have said this must stop. It could have been a foolish prank, I don't know, kids 20 years old, you don't know what they are going to do."
A deputy clerk of the trial court testified:
"Q. [By Mr. Bell] Alright, now, tell us what he said? A. As I was watching the various members of the jury sign the payroll, it was my business to watch them sign on the same line that they ordinarily would sign on all three copies of the payroll, and one or two of the jurors had already signed when Mr. Goodyear stepped up to sign, and I heard him remark that he had a similar experience two or three or more years ago, and I looked up to see who was making the statement. It kind of astounded me at the moment, but I didn't pay too much attention, and I continued with the payroll. As each signed, each man on the jury stepped out of the courtroom with their payment in hand to leave, and during the whole time I did not go out into the hall at all, because I had business here to continue with after the payroll was signed. I continued on with my work until about 6:30.
"Q. Did he make any further statement? A. No, sir, that's all I heard."
A newspaper reporter testified:
"Q. [By Mr. Bell] What did he say to you? A. That he was one of the four who refused to recommend mercy, because he would let no rapist free to run on the streets, especially after the experience of his own daughter.
"Q. Did he tell you what that experience was? A. Just that they were in a car; that his wife regarded it as a prank, but he thought it was more serious, and that she had just been forced to jump from the car and that her clothes were torn; no action on her at all, except she just jumped from the car and her clothes were torn. Therefore, he would not let any rapist free, and there were too many on the streets now.
"Q. Did he make any statement regarding potential rape? A. He said this may well have been one of the men after his daughter at that time. He said `He may just as well have been one of the men went after my daughter at that time. I wouldn't let any of them go, if he was guilty.' He didn't say that was the motive for the verdict, but that he just wouldn't let any of them free, and he would have killed the man that did it.
"Q. Did he use the term `potential rape'? A. Not that particular term, I don't think. What he meant was, he expressed that idea that there were too many of these men running around the streets who would rape these girls, and the word `potential' is just the word I used in my story, because I had to contrast. Just the specific word, I wouldn't say he used, but you see, I didn't overhear the conversation that *384 the Clerk heard here. When I walked in, there were only two jurors being paid off, and he was the last of the two  there were two of them. I just walked out of the courtroom with him and we were discussing the various elements that entered into this verdict. One was the fact that the girl had lived in Germany all these years through the War and came to the United States a virgin, only to be raped by an American tramp.
"Q. Use the word `tramp'? A. Oh, yes. However, that was just one of the elements; the man himself had convicted himself in the juror's opinion.
"* * * * * *
"Q. [By Mr. Gerstein] He did say he would find any rapist guilty if the evidence warranted it? A. Yes, sir; oh, yes. He didn't indicate he would find an innocent man guilty just because his daughter had had trouble, but he wouldn't recommend mercy if he found a rapist.
"Q. But at all times he conveyed to you he would require the State to prove the guilt by evidence? A. That's right; that's right."
The incident in question was fully heard before the trial judge who concluded that no prejudice existed that necessitated the vacation of the jury verdict. It does not appear that the juror's prejudice, if any, was directed toward the appellant, for it is abundantly clear from his statement that he would not convict an innocent man, but, at the same time, he would not vote for a recommendation of mercy where there existed sufficient evidence for conviction.
We have carefully considered the record of the voir dire examination of the juror and conclude that there is no evidence indicating that the juror withheld any information sought to be elicited from him by counsel for the appellant. The questions which the appellant contends support his position that the juror neglected to make known a prior incident which had happened to his daughter are the following:
"Have any of you ever had any connection with a violent crime of this nature?" and
"Are you conscious of any reason why you can't sit as a fair and impartial juror in this case?"
The former question was propounded collectively to prospective jurors, including the juror in question, and elicited no response. To the latter question, the juror responded, "None whatever".
This is not analogous to the situation existing in Loftin v. Wilson, Fla. 1953, 67 So.2d 185, which the appellant contends is controlling. In the Loftin case, the juror had had a specific known unpleasantness with one of the parties to the suit and failed or neglected to apprise counsel upon his voir dire examination of such differences as existed between the juror and the party that possibly would tend to prejudice the interests of that party. Nor is the situation as reflected in Russ v. State, Fla. 1957, 95 So.2d 594, similar to the case at bar. In the Russ case, the juror had personal knowledge of prior actions of the defendant in beating the decedent, and related these incidents to the other jurors in the jury room, thereby influencing their decision and verdict in the case. It was shown that prior to the juror's disclosure of his personal knowledge of the defendant's acts, the jury had voted for conviction with a recommendation of mercy, but after the juror's disclosure, the jury then returned a verdict of guilty without a recommendation of mercy. It is obvious that the Russ case is distinguishable from the case at bar.
"Not every irregularity which would subject a juror to censure should overturn the verdict. In order to authorize the setting aside of a verdict on account of misconduct of the jury, it must appear that such misconduct may have had an influence upon the final result, and caused injury to the *385 complaining party." 5 Wharton's Criminal Law and Procedure, § 2122, p. 312. A majority of the jury voted for mercy and no prejudice to the appellant can be determined by this juror's dissent.
Although the sufficiency of the evidence to support the verdict has not been challenged, nevertheless we have reviewed all of the testimony presented to the jury and we fail to find that appellant's conviction resulted in a miscarriage of justice or that the ends of justice dictate the granting of a new trial within the scope and meaning of § 924.33, Fla. Stat., F.S.A.
Affirmed.
PEARSON, J., and PEARSON, RAY, Associate Judge, concur.